UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

---

In re

4848, LLC,

    Debtor.

Case No. 12-36114

Chapter 11

---

MEMORANDUM DECISION ON OLIVE PORTFOLIO, LLC,
AS ASSIGNEE TO BMO HARRIS BANK, NA's MOTION FOR RELIEF
FROM THE AUTOMATIC STAY AND ABANDONMENT

---

On November 8, 2012, 4848, LLC, a single asset real estate debtor, filed a chapter 11 bankruptcy petition to stave off foreclosure on its property. Before the Court is the motion for relief from the automatic stay and abandonment filed by BMO Harris Bank, NA,[1] as it relates to the real property owned by the debtor. This Court has jurisdiction under 28 U.S.C. § 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(G). The parties briefed the matter, an evidentiary hearing was held on February 14, 2013, and the Court rendered an oral ruling on the motion on March 14, 2013. Based on the same, as well as the pleadings and other documents on file, the Court issues this Memorandum Decision, which constitutes its findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.

BACKGROUND

The debtor, 4848, LLC, was formed in 2000 and owns one parcel of real estate located at 4848 S. 76th Street, Greenfield, Wisconsin. The property contains approximately 28,830 square

---

[1] During the briefing phase, the note changed hands and the movant's official designation became: Olive Portfolio, LLC, as assignee to BMO Harris Bank N.A. f/k/a Harris N.A., successor by merger to Community Bank Group f/k/a Lincoln State Bank.

1

feet of rentable space, 17,407 square feet of which is currently leased to three separate commercial tenants. The debtor retains a third party management company, Siegel-Gallagher, to oversee the books, coordinate renovations and maintenance of the property, and negotiate with and place tenants into the property. Along with the general downturn in the economy, the debtor's occupancy and operating income decreased during the past few years.

The debtor had first executed a mortgage and General Business Security Agreement securing two promissory notes on December 29, 2000. That credit was subsequently renewed with the movant when the debtor executed a variable rate promissory note in the amount of $3,450,667.63 on December 10, 2004, along with another variable rate promissory note in the amount of $250,000.00 on January 1, 2008. Both notes were secured by perfected mortgages on the debtor's real property.

Although the notes matured on December 10, 2008, the debtor and BMO Harris entered into a forbearance agreement on April 28, 2010, wherein the outstanding obligations on the notes were due and payable on or before December 30, 2010. The forbearance agreement included the following provision:

> <u>Relief from the Automatic Stay</u>. As a material inducement to Lender to enter into this Agreement, Borrower hereby stipulates and agrees that Lender shall be entitled to relief from the automatic stay imposed by 11 U.S.C. § 362 or any similar stay or suspension of remedies under any other federal or state law in the event Borrower becomes subject to a bankruptcy or other insolvency proceeding, to allow Lender to exercise its rights and remedies with respect to the Collateral.

(Agreement Regarding Loans executed April 28, 2010, ¶ 13, p. 16). BMO Harris commenced a foreclosure action against the debtor on October 12, 2012.

A company related to the debtor due to similar ownership, 200 Ryan, LLC, another single

asset debtor, is also obligated to BMO Harris pursuant to a mortgage note. The debtor is a guarantor of 200 Ryan's indebtedness, and BMO Harris filed a contingent claim against the debtor for the deficiency amount owed by 200 Ryan. A foreclosure action regarding 200 Ryan's real property is currently pending. As of the petition date, BMO Harris was owed $2,869,383.79, including fees and costs, on the 4848 Notes and $3,654,586.61, including fees and costs, on the 200 Ryan Note. The sale of the Ryan property, which will reduce the overall claim, has yet to occur.

The debtor filed a plan and disclosure statement on February 6, 2013, wherein it proposed that its property and equity interests would be sold via a public auction after at least 90 days of marketing[2] and within 120 days from the effective date of the plan. The debtor would submit the opening bid at the auction in the amount of $3,000,000, and third parties would be allowed to exceed that bid, with the next bid being at least $3,100,000. BMO Harris would have the option to credit bid at the auction. If the debtor became the winning bidder, the debtor would repay the opening bid amount, over time, to BMO Harris. The debtor would also auction its equity interests, with the equity interest holders opening the bids in the amount of $50,000 if the debtor became the winning bidder for the property or $10,000 if the debtor was not the winning property bidder.

ISSUES

Two legal issues were raised by BMO Harris Bank's motion for relief from the automatic stay: (1) whether a prepetition stay waiver within a forbearance agreement between the debtor

---

[2]On February 14, 2013, Daniel Walsh, the managing member of TerraMed, LLC, the debtor's managing member, testified that the debtor intended to use its related management and investment company, Siegel-Gallagher, to market the real property for auction.

and BMO Harris amounts to "cause" for relief from the automatic stay under 11 U.S.C. § 362(d)(1), and (2) whether relief from the automatic stay should be granted because the single asset real estate debtor's proposed plan does not have "a reasonable possibility of being confirmed within a reasonable time" under 11 U.S.C. § 362(d)(3)(A).

## ARGUMENTS

*Debtor's Argument Regarding Prepetition Stay Waiver*.

The debtor contends the prepetition stay waiver contained in the forbearance agreement is void as a matter of law and unenforceable as against public policy. To enforce the policies of the Bankruptcy Code, the relief available to a debtor must not be circumvented by contract, and in this case, the prepetition stay waiver. A prepetition stay waiver is an *ipso facto* clause triggered upon the borrower's filing of a bankruptcy petition, and because the "purpose of the stay is to protect creditors as well as the debtor, the debtor may not waive the automatic stay." *Ostano Commerzanstalt v. Telewide Sys., Inc.*, 790 F.2d 206 ($2^d$ Cir. 1986). The public policy behind the automatic stay outweighs the policies of freedom of contract and encouraging out of court workouts.

*BMO Harris Bank's Argument Regarding Prepetition Stay Waiver*.

The public policy goal of encouraging out of court restructuring and settlement supports the enforceability of the prepetition waiver of the automatic stay included in the forbearance agreement. *See In re Cheeks*, 167 B.R. 817, 818 (Bankr. D. S.C. 1994). In this case, the debtor received substantial consideration from the lender in exchange for the prepetition stay waiver, including an additional eight months under the forbearance agreement to pay the obligation, which originally matured in 2008. As stated in the agreement, the stay waiver was a material

inducement to the lender entering into said agreement.

*Debtor's Argument Regarding Plan Confirmability*.

The debtor argues the real property is undisputedly necessary in order to proceed with its proposed plan and an effective reorganization is likely. The plan satisfies the requirements of the Code, including the "best interests" test and the "fair and equitable" standard in a cram down. The debtor's plan proposes to auction the property and the equity interests in the debtor in the open national marketplace, which will determine the actual value of the property. If the property is sold to a third party, BMO Harris will receive the proceeds from its collateral, thus receiving at least the same value of what it would receive in a liquidation, meeting the "best interests" test. Should BMO Harris believe the property is worth more than the $3,000,000 opening bid, it has the opportunity to credit bid. The auctions also comply with the "fair and equitable" requirements of the Code. Should the debtor's opening bid be the winning bid, BMO Harris will retain its liens until the balance of its secured claim is paid in full, satisfying section 1129(b)(2)(A)(i)(I) & (II). Should the property be sold to a third party in a cash sale or to BMO Harris in a credit sale, section 1129(b)(2)(A)(ii) is satisfied.

The debtor asserts that it can make necessary payments if it is the winning bidder at $3,000,000 *and* the creditor makes a section 1111(b) election because: (1) The electing creditor would receive a lien equal to the total amount of its allowed claim, $5,189,970 (the filed claim less the assumed value for 200 Ryan, LLC, property); (2) The electing creditor would receive an aggregate stream of payments at least equal to the electing creditor's allowed total claim[3]; and (3)

---

[3]This is explained in the debtor's brief as follows: "If the Debtor made equal monthly payments of $14,417 for 360 months, the aggregate stream of payments would equal $5,190,120, in compliance with § ll29(b)(2)(A)(i)(II). Finally, using a discount rate of 4% the net present

5

The present value of the electing creditor's stream of payments would equal the present value of the collateral.

The debtor also argues the auction procedures comply with the Code. Regarding the property auction, even though the debtor's opening bid is not a cash bid, it would be repaid subject to sections 1129(a)(7) and 1129(b)(2)(A). By not proposing to use a third-party stalking horse bidder, the debtor avoids the costly obligation for break-up fees. Additionally, regarding the equity interest auction, value is maximized for the benefit of the estate. When a creditor is paid less than it is owed and does not accept the plan, section 1129(b)(2)(B)(ii) provides that equity holders cannot retain any equity interests on account of their old investments unless an auction is held. The equity auction in the debtor's plan satisfies this requirement.

*BMO Harris Bank's Argument Regarding Plan Confirmability.*

BMO Harris argues the debtor's plan does not provide a reasonable possibility of a successful reorganization within a reasonable time. *See DB Capital Holdings*, *LLC*, 454 B.R. 804, 819 (Bankr. D. Colo. 2011); *see also* 11 U.S.C. § 362(d)(3)(A). The debtor's proposed auction arbitrarily sets an opening bid amount of $3,000,000, without any grant of authority within the Bankruptcy Code or state laws and without any reliable proof of value. The alternatives of allowing the lender the right to credit bid or a sale to a third party can be achieved via a sheriff's sale at a greatly reduced cost of sale to the lender. Furthermore, the debtor's

---

value of that stream of payments would equal $3,019,715, which is at least equal to the present value of the collateral. The Debtor's proposed budgets as part of the Plan can support a monthly payment to BMO in an amount more than $14,417 per month." (Brief in Support of Debtor's Objection to BMO Harris Bank NA's Motion for Relief filed 3/1/2013, p. 12). The discount rate, term, and monthly payment amount differ from the interest rate, term, and monthly payment amount proposed in the plan. (*See* Plan of Reorganization filed 2/6/2013, ¶ 2.3(b)(ii)).

6

requested 120 days of marketing after the effective date of the plan, whenever that might be, will only cause further delay without different results since the debtor has had four years since the original maturity of the notes to sell the property.

Notably, the plan fails to disclose the identity of Daniel Walsh, the managing member of the debtor's sole member, as a principal of both 4848, LLC, and Siegel-Gallagher Management Co., the proposed marketer, contrary to section 1129(a)(5).

The lender further argues that under the debtor's own liquidation analysis, the amount available to pay secured debts would be $4,012,108, which is more than the present value of deferred payments to the bank under the plan. The plan does not satisfy section 1129(a)(7)(A), since the lender would likely not receive "property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated."

The bank argues the plan does not satisfy a section 1111(b) election either; assuming an allowed secured claim of $5,166,000, the total principal and interest payments amortized over 25 years would equal only $5,002,432.30. Moreover, the debtor cannot prove its ability to execute a refinance or full payment by the maturity date of the plan should the debtor be the winning bidder, requiring further reorganization, which fails to meet the requirement for confirmation in section 1129(a)(11). The plan also violates section 1122(a) because the lender's unsecured claim is not in the same class as the remaining unsecured creditors; the debtor's creation of an impaired class of unsecured creditor to approve the plan unfairly discriminates against the lender.

Finally, BMO Harris contends the debtor's plan is unsustainable. Should the debtor be the winning bidder, $3,000,000 amortized over 25 years at 4.5% interest (the rate provided in the

7

plan for payment), with a balloon payment after 84 months, equals $16,675 per month. This is the exact monthly payment amount in the projections attached to the plan. However, the proposal does not appropriately protect the risk to the lender as the budgeted expenses have fluctuated, and shortfall is likely. Income projections are unsupported. If the lender were able to prove the value of the property is equal to the tax bill amount of $4,268,200 – as opposed to allowing the "auction" to value the property – the required monthly payments would be $23,724.04.

## DISCUSSION

Under 11 U.S.C. § 362(d)(2), a secured party is entitled to relief from the automatic stay of an act against property if "the debtor does not have any equity in such property ... and such property is not necessary for an effective reorganization." Although the debtor agreed that it has no equity in the property over and above the amount of the bank's secured claim, there is no real dispute that the property is necessary for an effective reorganization.

Alternative grounds for granting relief from the automatic stay include "for cause," 11 U.S.C. § 362(d)(1), or when the single asset real estate debtor has failed to timely "file a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time," 11 U.S.C. § 362(d)(3)(A). Pursuant to 11 U.S.C. § 362(g), the party requesting relief from stay has the burden of proof on the issue of equity and the party opposing the relief from stay has the burden of proof on all other issues.

The parties first dispute whether a prepetition stay waiver within a forbearance agreement between the debtor and BMO Harris amounts to "cause" for relief under section 362(d)(1). There appears to be an emerging trend to enforce such stay waiver agreements, although the

8

majority of courts in earlier cases addressing the issue have determined that neither the debtor nor a creditor may waive or limit the protection of the automatic stay. 9 Norton Bankr. L. & Prac. 3d § 175:10. Most of the more recent decisions have concluded that a prepetition agreement waiving defenses to relief from stay may be *considered as a factor* in deciding whether relief from stay for cause should be granted. *E.g., In re Desai*, 282 B.R. 527, 532 (Bankr. M.D. Ga. 2002) ("Although prepetition agreements waiving the protection afforded by the automatic stay are enforceable, such waivers are not per se enforceable, nor are they self-executing.").

One court has found that a prepetition stay waiver may not be enforceable in a single asset case because the enforcement of such a waiver could approximate a prohibition against filing for bankruptcy protection, which is contrary to public policy. *In re Jenkins Court Assocs.*, 181 B.R. 33, 27 (Bankr. E.D. Pa. 1995) (waiver not enforced absent complete evidentiary hearing concerning whether debtor commenced bankruptcy case in bad faith, and whether circumstances or market conditions had changed during period between execution of waiver and filing of petition). Here, there have been no allegations that market conditions have changed since the waiver agreement was entered into. In addition to these factors, at least one other court holding a waiver may be enforceable has posited a list of considerations in determining whether to lift the stay when the parties have agreed prepetition to waive the stay in a later bankruptcy.

The Vermont bankruptcy court proposes the following considerations: (1) the sophistication of the party making the waiver; (2) the consideration for the waiver, including the creditor's risk and length of time the waiver covers; (3) whether other parties are affected including unsecured creditors and junior lienholders; (4) the feasibility of the debtor's plan; (5)

9

whether there is evidence that the waiver was obtained by coercion, fraud, or mutual mistake of material factors; (6) whether enforcing the agreement will further the legitimate public policy of encouraging out of court restructurings and settlements; (7) whether there appears to be a likelihood of reorganization; (8) the extent to which the creditor would be otherwise prejudiced if the waiver is not enforced; (9) the proximity in time between the date of the waiver and the date of the bankruptcy filing and whether there was a compelling change in circumstances during that time; and (10) whether the debtor has equity in the property and the creditor is otherwise entitled to relief from stay under section 362(d). *In re Frye*, 320 B.R. 786, 791 (Bankr. D. Vt. 2005).

Bad faith is touched upon in this case only in the sense that the debtor is causing unreasonable delay and unnecessary expense in thwarting the creditor's legitimate rights, resulting in prejudice to the creditor if the waiver is not enforced. More nefarious aspects of bad faith usually require an evidentiary hearing, as was pointed out in *Jenkins Court Assocs.*, 181 B.R. at 36, but the delay that is complained of here can be objectively determined from the present record. Some of the other considerations, listed in *Frye*, 320 B.R. at 791, are not seriously at issue. The managing member of the debtor's managing member is admittedly a sophisticated business person, and no coercion, fraud or mutual mistake is alleged. No compelling change in circumstances is apparent, other than the expiration of a considerable length of time, plus the pending foreclosure of another property, which will determine the lender's claim, and movement in the overall economy. The effect on unsecured creditors is negligible as they will probably receive nothing or almost nothing under any scenario. Other aspects of the feasibility and confirmability of the proposed plan are discussed below.

The public policy arguments made by both sides are relatively balanced in this case. The

10

debtor claims the clause is unenforceable *per se* because the protection afforded is of fundamental and vital importance to any debtor. In the case of a single asset real estate debtor, like this one, the entire disposition of the case depends on not being able to waive the stay as an early loss of the only property in the estate dooms reorganization. The Court does not take this policy lightly and would be dismayed if such clauses were used routinely. Nevertheless, the *Desai* court and others have persuasively held that a waiver can be a consideration in determining "cause" for relief from stay. It is not the only consideration and must be only one of many possible circumstances that can constitute cause. This Court finds this latter approach is the better view.

The lender argues that such a clause facilitated the out of court workout in this case because it would not have entered into a forbearance agreement without it. Protecting the bank from the expense and delay of a full blown chapter 11 was important consideration. While the forbearance agreement with this waiver was being negotiated, the bank put off foreclosing for almost a year and a half. After the agreement with the waiver was executed, the bank still waited almost two and a half years to foreclose. In all, between December 10, 2008, when the notes matured, and October 12, 2012, when the foreclosure was filed, the debtor gained almost four years to try to turn this operation around by either selling it or refinancing, however difficult that might have been in the current economy. The Court holds it is not fair to delay this creditor any longer. The debtor has already had considerable advantage from the forbearance agreement and the waiver, and it is highly doubtful an additional four months of marketing will result in a better scenario than lifting the stay now.

The Court has also considered the arguments of the parties concerning the debtor's

proposed plan, namely factors numbered (4) and (7) in *Frye*, 320 B.R. at 791; that is, whether the debtor's plan is feasible and whether there is a likelihood of reorganization. Even though this Court has held that the waiver of the automatic stay is enforceable, a facially confirmable and feasible plan might have tipped the scales in the debtor's favor. This proposed plan did not do so.

The debtor argues that if the debtor is the buyer, the plan can satisfy the requirements of section 1129(b)(2) and even survive a section 1111(b) election by the creditor – which is only a factor if the asset is retained, not sold – because the creditor will retain its lien and will receive payments equaling the present value of the creditor's interest in the property, valued at confirmation. 11 U.S.C. §1129(b)(2)(A)(i). The other two subparagraphs of that subsection are met because the plan provides that the creditor can credit bid, as required by section 1129(b)(2)(A)(ii), and no "indubitable equivalent" is offered, rendering section 1129(b)(2)(A)(iii) inapplicable. Unfortunately, the technical requirements of confirmation can only be met by applying the debtor's mathematical sleight of hand. Failure is still probable as practical contingencies play out.

The debtor's position with respect to the plan's qualification for confirmation in the face of an 1111(b) election may be mathematically correct, but its assumptions are built on shifting sands. It argues the creditor will receive at least the total amount of its allowed claim, $5,189,970 (filed claim less the assumed value for 200 Ryan, LLC property, which has a tax estimate of $1,334,000), and it reaches this conclusion by multiplying $14,417 per month for 360 months. This is not the proposed payment or the proposed term of the plan, but it is mathematically what is needed to support the $3,000,000 value, the bid that would award the

12

debtor the property. The debtor then applies the present value of the electing creditor's total stream of payments to arrive back at the present value of the collateral. The debtor uses a discount rate of 4% (for 360 months? Probably, since that was the term used to get to the total claim), and the present value of stream of payments equal to $3,019,715, which is at least equal to the $3,000,000 present value of the collateral. The "value" of the property and the opening bid set by the debtor appear to be the capitalized amount of slightly less than what the debtor can afford. Circular reasoning like this is not persuasive, especially when it bears no resemblance to the proposed plan terms.

BMO Harris argues, and this Court agrees, that the debtor's plan is too speculative and too attenuated to comprise a reasonable possibility of a successful reorganization within a reasonable time. *See DB Capital Holdings*, *LLC*, 454 B.R. 804, 819 (2011); *see also* 11 U.S.C. § 362(d)(3). The opening bid of $3,000,000 is completely arbitrary. The monthly revenues predicted rise from $34,260 to $41,368 over the course of 2013 (*see* Addendum 4 to Plan), but Mr. Walsh's testimony about hoped for tenants did not inspire confidence that this will occur. Much of the increase in revenue appears to be an increase in real estate tax charges to tenants, which should be a mere pass through. The tight budget is not sustainable, especially if anticipated revenues are not attained.

The alternatives of allowing the lender the right to credit bid or a sale to a third party can be achieved via a sheriff's sale at a greatly reduced expense to the lender (due to the 6% broker fees, commissions, 2.5% auctioneer fees, advertising costs, title company fees, and other necessary costs to be incurred under the debtor's proposal, which the bank estimates to be approximately $255,000). The debtor's requested 120 days of marketing *after the effective date*

*of the plan* will only cause further delay without different results, since the debtor has already had four years since the original maturity of the notes to sell the property. Determining the exact amount of the claim, which affects feasibility, would probably take even longer. If the claim is higher, the plan is instantly unfeasible, and the creditor would have been further delayed. The debtor's numbers are only realistic if the 200 Ryan, LLC, property sells at 100% of its tax assessed value, so the feasibility of the debtor retaining the property is pure speculation.[4]

The plan also violates section 1122(a) because the lender's unsecured claim is not in the same class as the remaining unsecured creditors; the debtor's creation of an impaired class of unsecured creditors to approve the plan unfairly discriminates against the lender.

The debtor's proposed plan for a "sale" to set value is, to say the least, creative. However, apart from the numbers outlined above, other flaws show the plan cannot be confirmed. The debtor's proposal, if it is the only bidder, is not a sale at all; it is a cram down, and not a feasible one at that, as shown above. A sale under section 363(f), assuming all the subsection requirements are met, results in a transfer of property, and the proceeds are then subject to the secured creditor's interest. That would not happen under this plan because a "sale" to the debtor, which defines itself as a "qualified bidder," would result in no proceeds. The lender would, in essence, be forced to finance the retention by the debtor. That is a cram down, not a sale. Other qualified bidders, as defined in the Auction Procedures, have to submit a

---

[4]The debtor values the 4848 property at 70% of its tax assessed value (the debtor's principal testified he is contesting the assessment), but predicts a sale of the 200 Ryan property at 100% of its tax estimate, maximizing reduction of the creditor's claim. Given the limits of the debtor's cash flow, all uncertainties – the value of the 200 Ryan property, the interest rate, the calculation of payments – would have to go the debtor's way, or the plan becomes unfeasible.

14

Case 12-36114-mdm    Doc 76    Filed 04/08/13    Page 14 of 16

*of the plan* will only cause further delay without different results, since the debtor has already had four years since the original maturity of the notes to sell the property. Determining the exact amount of the claim, which affects feasibility, would probably take even longer. If the claim is higher, the plan is instantly unfeasible, and the creditor would have been further delayed. The debtor's numbers are only realistic if the 200 Ryan, LLC, property sells at 100% of its tax assessed value, so the feasibility of the debtor retaining the property is pure speculation.[4]

The plan also violates section 1122(a) because the lender's unsecured claim is not in the same class as the remaining unsecured creditors; the debtor's creation of an impaired class of unsecured creditors to approve the plan unfairly discriminates against the lender.

The debtor's proposed plan for a "sale" to set value is, to say the least, creative. However, apart from the numbers outlined above, other flaws show the plan cannot be confirmed. The debtor's proposal, if it is the only bidder, is not a sale at all; it is a cram down, and not a feasible one at that, as shown above. A sale under section 363(f), assuming all the subsection requirements are met, results in a transfer of property, and the proceeds are then subject to the secured creditor's interest. That would not happen under this plan because a "sale" to the debtor, which defines itself as a "qualified bidder," would result in no proceeds. The lender would, in essence, be forced to finance the retention by the debtor. That is a cram down, not a sale. Other qualified bidders, as defined in the Auction Procedures, have to submit a

---

[4]The debtor values the 4848 property at 70% of its tax assessed value (the debtor's principal testified he is contesting the assessment), but predicts a sale of the 200 Ryan property at 100% of its tax estimate, maximizing reduction of the creditor's claim. Given the limits of the debtor's cash flow, all uncertainties – the value of the 200 Ryan property, the interest rate, the calculation of payments – would have to go the debtor's way, or the plan becomes unfeasible.

deposit of $150,000 and be able to make a cash offer of $3,100,000, which the debtor clearly cannot do. This procedure discriminates unfairly in favor of the debtor. Thus, the debtor's proposed sale is not fair and equitable, as is required by section 1129(b)(1).

Marketing by Mr. Walsh's management company, Siegel-Gallagher, is a non-starter. First, the relationship is not disclosed and probably would not survive the appointment process under 11 U.S.C. § 327(a). While its commission might be higher if the property is sold to a third party, it has conflicting motivations to not widely market the property because the equity security holder who is a principal of both the debtor and the management company might prefer to keep it. The Court must infer that is the case; otherwise, he would let this property go.

The debtor proposes alternatives of sale to a third party or the bank's credit bid, and apparently this was intended to meet Code requirements involving secured creditor protections, provided the debtor retains the property. If the cram down provisions appeared reasonable, the plan might pass muster, but not in this case. Indeed, these alternate provisions disclose weaknesses that support immediate lifting of the stay. If only the debtor bids, the bank could easily obtain the property with a credit bid, but will have lost at least four months that it could have saved by completing the pending foreclosure. The same is true if it believes third party bids are not high enough. Given the limited pool of buyers of this magnitude, the bank might well have attracted the same pool of bidders at foreclosure, with the same result. Furthermore, the bank has not consented to use of its cash collateral (rents) for the costs of sale, which it has stated are unreasonable and unnecessary as proposed, thereby generating further litigation. *Cf.* 11 U.S.C. § 506(c)

To summarize, the debtor's plan is sustainable only if every eventuality – in life and in

court – falls the debtor's way. The debtor would require a substantial increase in revenue to meet it's own projections. Budgeted expenses are very tight with payments at $16,675. There is insufficient cushion for capital improvements for new tenants or for a dry period when a tenant is lost. Any of these uncertainties could be fatal, and a lot can happen in seven years, the plan's proposed due date for refinancing. Therefore, the need for further reorganization is highly probable. *See* 11 U.S.C. § 1129(a)(11).

The allowance of the credit bid by the bank shows the futility of allowing this plan to go forward. If the retention of the property by the debtor at the value stated is not acceptable to the bank, and it is not, it could easily credit bid more than the debtor's initial bid. Retention by the debtor under this proposal is essentially consensual, and it is not. This makes the retention option by the debtor pointless. Third party bids could be obtained by the bank through the foreclosure process, and the bank could control expenses. The debtor's right to a surplus, which appears to be highly unlikely, would be protected, again by the foreclosure process. There is no good reason to make the bank credit bid against either the debtor or third parties so it can have what it should have now. The bank is the only creditor with anything to lose, and any further delay and expense does it no justice.

For the reasons stated above, the Court granted the motion for relief from the automatic stay filed by Olive Portfolio, LLC, as assignee to BMO Harris Bank.

April 8, 2013

Margaret Dee McGarity
United States Bankruptcy Judge